

# In the Missouri Court of Appeals
## Western District

SHAWN MICHAEL YUILLE,       )
                    Appellant,  )        WD84802
v.                          )
                             )
STATE OF MISSOURI,         )        FILED: October 11, 2022
                Respondent.  )

## APPEAL FROM THE CIRCUIT COURT OF LIVINGSTON COUNTY
### THE HONORABLE RYAN W. HORSMAN, JUDGE

### BEFORE DIVISION THREE: CYNTHIA L. MARTIN, P.J.,
### LISA WHITE HARDWICK, AND W. DOUGLAS THOMSON, JUDGES

Shawn Yuille appeals the denial of his Rule 24.035 motion after he pled guilty to second-degree felony murder and first-degree endangering the welfare of a child. Yuille contends the motion court clearly erred in denying his post-conviction motion because his sentence was grossly disproportionate. He also argues defense counsel was ineffective for failing to argue proportionality at sentencing and to object to the disproportionate sentence after it was imposed. For reasons explained herein, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

On November 25, 2017, Yuille, his five-year-old daughter ("I.R.Y."), and Jeremy Osburn went to a Wal-Mart in Chillicothe, where Osburn purchased a two-pack of air duster. Air duster is a canned cleaning product containing fluorocarbon and compressed air. As Yuille drove the truck away from Wal-Mart, both he and Osburn inhaled or "huffed" the air duster.

Later, Yuille was driving on Washington Street when he took a second huff from the air duster can. After Yuille inhaled this time, he passed out in the driver's seat with his foot on the accelerator. The truck accelerated to what witnesses described as a "great rate of speed" and struck Danette Rardon's car. When it hit Rardon's car, the truck was traveling at a rate of 88 miles per hour at 100% throttle with 0% braking. The speed limit in that area was 25 miles per hour.

Rardon was pronounced dead at the scene. Her body was pinned in the driver's seat and had to be cut out of her car. Yuille was found lying on the ground just outside the driver's side of the truck. Yuille and Osburn told officers at the scene that, before the crash, Yuille was having trouble shifting the truck's transmission into drive and that, after he was able to put the car in drive, the accelerator got stuck. Yuille had severe injuries and was flown by Life Flight to a hospital in Kansas City. I.R.Y., who was not properly restrained in her car seat at the time of the crash, had a significant laceration on her forehead, her face was covered in blood, and she, too, had to be flown to a hospital in Kansas City. Osburn had injuries to his lower extremities, but he refused medical assistance.

2

Later that day, Osburn confided to a friend that it was his idea to buy the air duster. Osburn told his friend that Yuille had huffed the air duster twice and that, after the second time, Yuille was unresponsive and had his foot pressed down on the accelerator. Osburn said he had to reach over and grab the wheel, and he attempted to weave the truck in and out of traffic before hitting Rardon's car. After Osburn's friend reported what Osburn had told him, the police interviewed Osburn. Osburn gave the police a statement that was consistent with what he had told his friend. A mechanical evaluation of the truck's acceleration pedal revealed it had been functioning properly at the time of the crash.

Yuille was arrested five days after the crash. When officers interviewed him following his arrest, his version of the events was consistent with Osburn's statement. Yuille claimed that he had restrained I.R.Y. in her booster seat but "she often got herself loose." Yuille also told the police that he had never inhaled air duster before and thought it was "like helium."

Yuille was originally charged with the class A felony of second-degree felony murder and the class B felony of endangering the welfare of a child. The State and Yuille entered into a plea agreement under which the State agreed to amend the endangering the welfare of a child charge to a class D felony and recommend that Yuille receive a total sentence of no more than 20 years for the second-degree felony murder and endangering the welfare of a child charges.

During the guilty plea hearing on April 15, 2019, the State informed Yuille that the range of punishment for second-degree felony murder was 10 to 30 years

3

in prison, and the range of punishment for endangering the welfare of a child was up to seven years in prison, up to one year in the county jail, up to a $10,000 fine, or any combination of those fines and incarcerations; thus, the possible total sentence for the two offenses was 37 years. The court restated the ranges of punishment and the possible total sentence. The court also advised Yuille multiple times that it was not bound by the State's recommendation of a 20-year ceiling on his total sentence and that it could sentence him to anything within the full range of punishment on each charge and run the two sentences consecutively. Yuille stated that he understood and still wanted to plead guilty. The court accepted Yuille's guilty plea and ordered the completion of a Sentencing Assessment Report ("SAR").

Yuille's SAR included a summary of the circumstances of the incident and Yuille's and Osburn's statements about the incident. The SAR noted that, for his role in the incident, Osburn was charged with and convicted of the misdemeanor of second-degree endangering the welfare of a child. He was sentenced to 60 days in jail. The SAR further noted that, after Osburn served his 60 days in jail, he was sent to prison for a 2016 conviction for distribution of a controlled substance and was currently on parole supervision.

The SAR detailed Yuille's criminal history. Yuille, who was 23 years old at the time of the crash, had a criminal history that included the misdemeanors of violating an adult order of protection and private peace disturbance in 2011; speeding in 2014; the misdemeanors of receiving stolen property and second-

4

degree tampering with a motor vehicle in 2015; the felony of stealing a motor vehicle in 2015; operating a motor vehicle in a careless and reckless manner in 2015; and the misdemeanor of making a false report in 2016. For the 2015 felony of stealing a motor vehicle, Yuille received a suspended imposition of sentence and five years of probation. The SAR discussed Yuille's risk assets and liabilities and other assessment factors and concluded that he was a moderate risk for community supervision and an average risk for prison. The SAR noted that, between fiscal years 2013 and 2018, the average prison sentence for second-degree murder in Missouri was 21 years.

The SAR contained victim impact statements from Rardon's mother, father, and brother describing the enormity of their loss. The SAR also included a description of the crash's impact on I.R.Y. The SAR stated that, while I.R.Y. has healed from her physical injuries, she has a scar across her forehead and is engaged in weekly therapy to address her trauma.

During the July 2, 2019 sentencing hearing, defense counsel noted that the SAR had erroneously stated that Yuille was unemployed when he was, in fact, employed full time at a tire store at the time of the incident. The State then called Rardon's father and mother to testify about the impact of the death of their daughter, a 39-year-old lawyer who was very close to her parents, brother, nieces, and nephew and was involved in numerous boards and charities. The State stood by its recommendation of a total combined sentence of 20 years.

In response, defense counsel pointed out that the SAR showed Yuille was an average risk after completing his sentence in an appropriate way. Defense counsel stated that Yuille "understands truly the mistake he made" and that he "accepts full responsibility" for "that terrible choice he made that robbed this family of that wonderful person." Defense counsel concluded by stating Yuille "simply asks that you be fair in your judgment, that you consider the elements and the issues set forth in the Sentencing Assessment Report, and that you grant him leniency in this matter to the extent you think that is also just under the circumstances." Yuille then addressed the court, stating, "Sir, I'm just a kid. I made a horrible decision, and [for] that I have to live with the consequences every day until the rest of my life; and I'm truly sorry that I took the life of Danette Rardon."

Before pronouncing sentencing, the court addressed Yuille:

Mr. Yuille, no matter what the sentence is here today, you are a young man and you will be able to live life again outside the walls of a prison, and that is an opportunity that Ms. Rardon does not have. It's an opportunity that you have taken from her, and it's an opportunity that you've taken from her family as evidenced by the Sentencing Assessment Report statements and the statements you heard here today.

Miss Rardon was a beloved family member, daughter, sister, aunt, and a beloved member of this community.

I understand that there may be arguments that you did not have a gun to her head or anyone else's head, but quite frankly, my honest opinion is you were driving a vehicle 88 miles per hour down Washington Street on a Sunday afternoon with your own child in the car under the influence of air duster.

6

And as I've been thinking about this [for] the last several weeks, that is probably the fact that strikes me the most, is you took those steps knowing that your own child was in your car, and those steps did lead not only to her serious injury but also the death of Ms. Rardon.

And you said moments ago that you are only a kid. You are not a kid. You were not a kid at the time of this crime, you're not a kid now, and I'm not going to treat you as a kid.

[Defense counsel] asked me to be fair and to take into consideration fairness and leniency, and I will be fair. I will not be lenient. I am going to do what I believe is right and what is just.

The court then sentenced Yuille to 30 years in prison for second-degree felony murder and five years in prison for endangering the welfare of a child. The court ordered that the sentences be served consecutively, for a total of 35 years. The court further ordered that the sentences be served consecutively to any other sentence Yuille had.

After pronouncing sentence, the court reiterated that Yuille was "a young man" and that, even if he served every day of the 35-year total sentence, he would "have the opportunity to live again outside of those walls." The court further stated:

And, sir, I do appreciate the fact that you did take responsibility [for] your actions. I do. You saved the Rardons the pain of a trial, and I have taken that into consideration, and I know that the State did as well in amending the charges. With that, you still must be held accountable.

Yuille filed a *pro se* Rule 24.035 motion, which was later amended by appointed counsel. In his amended motion, Yuille claimed, *inter alia*, that his sentence violated his constitutional right to a proportionate sentence and that

defense counsel was ineffective for failing to argue for a proportionate sentence and to object to the disproportionate sentence he received. An evidentiary hearing was held, during which defense counsel testified that he had brokered a plea agreement to amend the information to charges that lowered Yuille's total possible sentence from 45 years to 37 years. Defense counsel further testified that his strategy at sentencing was to argue that Yuille had accepted responsibility and expressed remorse and that Osburn "had been treated very leniently for conduct which essentially was nearly identical." Defense counsel's strategy also included noting "the historical information from the SAR regarding what could be expected from this sort of charge."

Following the evidentiary hearing, the motion court entered its findings of fact and conclusions of law denying Yuille's 24.035 motion. In the judgment, the court found defense counsel's testimony credible and his sentencing strategy reasonable. The court further found:

> The Court had significant information before it at sentencing, and no evidence elicited at the Motion hearing would have modified the Court's decision, including arguments of proportionality. Mr. Osburn's circumstances were not an adequate comparison for the crimes of [Yuille] for a number of reasons, including but not limited to Mr. Osburn's position as the passenger instead of driver, the cover-up acts of [Yuille] requiring the cooperation of Mr. Osburn to disprove and the parentage of the minor child who was injured in this case.

The court concluded that Yuille's sentences were not grossly disproportionate to the crimes of second-degree murder and first-degree child endangerment.

8

Therefore, the court denied all of the claims in Yuille's Rule 24.035 motion. Yuille appeals.

## STANDARD OF REVIEW

We review the denial of a post-conviction motion for clear error. Rule 24.035(k). The motion court's findings and conclusions are clearly erroneous only if a review of the entire record leaves us with a definite and firm impression that a mistake was made. *Dobbins v. State*, 187 S.W.3d 865, 866 (Mo. banc 2006). We defer to the motion court's determination of the witnesses' credibility. *Cooper v. State*, 621 S.W.3d 624, 630 (Mo. App. 2021). We will affirm the motion court's judgment if it is sustainable on any legal ground supported by the record. *Swallow v. State*, 398 S.W.3d 1, 3 (Mo. banc 2013).

To obtain post-conviction relief on an ineffective assistance of counsel claim, Yuille had to establish, by a preponderance of the evidence, that defense counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under the same or similar circumstances and that he was thereby prejudiced. *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To demonstrate prejudice, Yuille had to show that "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Deck v. State*, 68 S.W.3d 418, 426 (Mo. banc 2002) (quoting *Strickland*, 466 U.S. at 694)). Yuille had to prove both the performance and prejudice prongs of this test to prevail, and if he failed to satisfy either prong, we need not consider the other. *Cone v. State*, 316 S.W.3d 412, 415 (Mo. App. 2010).

## ANALYSIS

In Point I, Yuille contends the motion court clearly erred in denying his claim that his sentence violated his right to proportionate sentencing under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 2, 10, and 21 of the Missouri Constitution. Specifically, he argues that his 35-year total sentence was grossly disproportionate to the gravity of the harm caused by his offenses and his culpability and as compared to the sentence that Osburn received and the sentences that other defendants convicted of the same or similar offenses have received.

"[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). "Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to the offense.'" *Graham v. Florida,* 560 U.S. 48, 59 (2010) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). Proportionality "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime." *Id*. at 60 (internal quotation marks and citation omitted).

10

To determine whether a sentence was grossly disproportionate, "we are to consider the gravity of the offense and the harshness of the penalty." *Glover v. State,* 477 S.W.3d 68, 74 (Mo. App. 2015). "Gross disproportionality will be found only in exceedingly rare and extreme cases." *Duncan v. State*, 539 S.W.3d 95, 109 (Mo. App. 2018) (citation omitted). "A sentence within the range prescribed by statute generally will not be found excessive, or grossly disproportionate, to the crime committed." *Id.* (citation omitted). "This is because we owe substantial deference to the legislature's determination of proper punishment." *Burnett v. State,* 311 S.W.3d 810, 815 (Mo. App. 2009) (citing *State v. Pribble*, 285 S.W.3d 310, 314 (Mo. banc 2009)). "Additionally, trial courts have broad discretion in their sentencing function, including but not limited to the discretion to order consecutive or concurrent sentences." *Eccher v. State*, 629 S.W.3d 113, 117 (Mo. App. 2021).

If, after considering the gravity of the offense and the harshness of the penalty, we determine that the sentence was not grossly disproportionate, then "comparisons to sentences given to other defendants for the same or similar crimes are irrelevant." *Pribble*, 285 S.W.3d at 314. As the Supreme Court explained in *Pribble*, "Only in the rare case that an inference of a grossly disproportionate sentence is present does a reviewing court then compare the sentences imposed on other criminals in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions." *Id.* at 314 n.4. *See also State v. Lee*, 841 S.W.2d 648, 654 (Mo. banc 1992) (holding that a life

11

sentence (30 years) for a first-degree robbery conviction was "not disproportionate, much less grossly disproportionate," and, therefore, a comparison to sentences given to other defendants for the same or a similar crime was irrelevant).

Yuille acknowledges that, if we look only at the harm or threatened harm caused by his actions, his 35-year sentence was not grossly disproportionate. However, he argues that he was less culpable because he lacked malicious intent or the motive to harm others, so his sentence was grossly disproportionate. We disagree. Yuille voluntarily inhaled air duster two times while driving a truck in which his five-year-old child was a passenger and was not properly restrained. According to Osburn, the purpose of inhaling air duster is to get high and black out, and he and Yuille had previously inhaled air duster together. Thus, Yuille knew that the air duster could cause him to black out *while he was driving*. While Yuille maintained he had never inhaled air duster before doing so that day, if that were true, the fact that he chose to inhale, for the first time, a substance whose effects were purportedly unknown to him while he was driving a truck with his child as an improperly-restrained passenger would not make him less culpable. Yuille's voluntary decision to act in a manner that created a substantial risk to his child's life resulted in a violent, high-speed crash that not only caused serious physical and psychological injury to his child but also killed the innocent driver of another car.

Section 557.036.1, RSMo 2016, instructs courts to determine the duration of a sentence "under all the circumstances, having regard to the nature and circumstances of the offense and the history and character of the defendant." It is clear from the court's comments at sentencing that the court did just that. Yuille's offenses of second-degree felony murder and endangering the welfare of a child were grave. Moreover, despite being only 23 years old at the time of these offenses, Yuille had committed a prior felony offense for which he was on probation and several prior misdemeanor and traffic offenses. The State had credited Yuille for accepting responsibility for these offenses and sparing Rardon's family the pain of a trial by amending the charges, which lowered the possible total sentence from 45 to 37 years. The court also considered these mitigating factors, as it did not impose the maximum seven-year sentence on the endangering the welfare of a child conviction. Comparing the gravity of the offenses to the harshness of the penalty, we cannot say that Yuille's sentence of 35 years, which was within the statutory range prescribed by the legislature for his offenses, was grossly disproportionate.[1] The motion court did not clearly err in denying this claim. Point I is denied.

---

[1] Having found that Yuille's sentence was not grossly disproportionate, any comparison of his sentence to sentences given to others, including Osburn, is irrelevant. *Pribble*, 285 S.W.3d at 314. *Ex gratia*, we note that any comparison to Osburn's sentence would be unpersuasive because Osburn was not charged with second-degree felony murder and Yuille, as the driver of the truck and I.R.Y.'s parent, was far more culpable than Osburn for the offense of endangering the welfare of a child.

In Point II, Yuille contends the motion court clearly erred in denying his claim that defense counsel was ineffective for failing to argue for a proportionate sentence. In particular, he argues that defense counsel was ineffective for failing to argue the lenient treatment of Osburn and the average sentence for second-degree murder in Missouri. As we found in Point I, however, Yuille's sentence was not grossly disproportionate; therefore, any comparison of his sentence to Osburn's sentence or to any other sentences was irrelevant. As a result, Yuille cannot establish that there is a reasonable probability that, but for defense counsel's actions, the result of the proceeding would have been different. *See, e.g., State v. Harris*, 868 S.W.2d 203, 209 (Mo. App. 1994) (holding the movant could not demonstrate he was prejudiced by counsel's failure to offer irrelevant evidence). Because Yuille cannot demonstrate that he was prejudiced by defense counsel's failure to make an irrelevant argument, the motion court did not clearly err in denying this claim. Point II is denied.

In Point III, Yuille contends the motion court clearly erred in denying his claim that defense counsel was ineffective for failing to object to the court's imposition of a disproportionate sentence. Because Yuille's sentence was not grossly disproportionate, an objection to the sentence on this basis would have been non-meritorious. Counsel will not be found ineffective for failing to make a non-meritorious objection. *Butler v. State*, 557 S.W.3d 427, 435-36 (Mo. App. 2018). Point III is denied.

14

## CONCLUSION

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.

15