DEFENDANT DUNCAN: Yes, sir.
THE COURT: And I could give you probation and then that would mean you wouldn't have to serve that 85 percent.
DEFENDANT DUNCAN: Yes, sir.
THE COURT: That it will ultimately be up to me.
DEFENDANT DUNCAN: Yes, sir.
THE COURT: You will serve-and in the Count 2, the sentence will be 3 years.
DEFENDANT DUNCAN: Yes, sir.
THE COURT: And you know that you've got to go serve that three?
DEFENDANT DUNCAN: Yes, sir. I understand.
THE COURT: All right. On the date of sentencing you should be prepared to go into custody.
DEFENDANT DUNCAN: Yes, sir.
The court then discussed the various constitutional rights attendant to trial that Duncan was relinquishing through his guilty pleas, and Duncan acknowledged understanding them and that he was waiving them by pleading guilty. The court then returned to the issue of sentencing:
THE COURT: Okay. Now, as it relates to these matters, sir, you understand that the state at the sentencing is going to ask for something different than you want? You understand that?
DEFENDANT DUNCAN: Yes, sir.
THE COURT: Ms. Lundak?
MS. LUNDAK: We're asking for 12 years.
THE COURT: Okay. You understand the state is going to ask for 12?
DEFENDANT DUNCAN: Yes, sir.
THE COURT: Okay. And, of course, you are going to request that I put you on probation on Count 1, I would assume; right?
DEFENDANT DUNCAN: Yes, sir.
THE COURT: But it's my decision ultimately.
DEFENDANT DUNCAN: Yes, sir.
THE COURT: All right. As it relates to this matter, sir, has anyone promised you anything to get you to plead guilty other than what the prosecutor has recommended?
DEFENDANT DUNCAN: No, sir.
THE COURT: Okay. And have you discussed this case fully with your lawyer?
DEFENDANT DUNCAN: Yes, sir.
THE COURT: And you've talked to him about your rights in all this regard?
*101 DEFENDANT DUNCAN: Yes, sir.
THE COURT: And, as it relates to these matters, you understand if you plead guilty you're giving up all the rights we've already talked about?
DEFENDANT DUNCAN: Yes, sir.
Duncan acknowledged shooting Payne five times with a deadly weapon, knowing that it likely would result in Payne's death. Duncan advised the court that he was pleading guilty because he was, in fact, guilty, and he further indicated that no one had forced or coerced his pleas. Duncan denied having any complaints or criticisms of counsel before the court returned, once again, to the issue of sentencing.
THE COURT: Now, there's going to be a Sentencing Assessment Report. Do you understand that?
DEFENDANT DUNCAN: Yes, sir.
THE COURT: And when that Sentencing Assessment Report comes back to me they make recommendations to me as to what they think I should do.
DEFENDANT DUNCAN: Yes, sir.
THE COURT: Or they might put in there percentages of this is how many people do this, this is how many defendants are sentenced to this particular sentence or not. Do you understand that?
DEFENDANT DUNCAN: Yes, sir.
THE COURT: But I don't have to follow that. I make the ultimate decision. Do you understand that?
DEFENDANT DUNCAN: Yes, sir.
THE COURT: Okay. You understand, sir, that if I choose not to put you on probation you cannot take back your plea of guilty for that reason?
DEFENDANT DUNCAN: Yes, sir. I understand.
The court accepted Duncan's pleas and set the matter for sentencing.
At the sentencing hearing, the court received victim impact evidence and testimony from Duncan. During his testimony, Duncan attempted to justify his conduct by claiming that he shot Payne only because he feared for his own life. Duncan also relayed that he was in renal failure and had been since 2009. He further testified to the effects of his renal failure on his diet and medications. Duncan's Counsel offered various medical records into evidence to support Duncan's assertions regarding his renal failure.[5]
The court permitted the parties to argue for appropriate punishment, and the State offered the following argument:
MS. LUNDAK: Yes, Your Honor. The first thing I would like to say to the Court is that the defendant's health is not a mitigating factor. He was healthy enough to go over to start a confrontation with Norris Payne. He was healthy enough to go over there with a loaded gun, and he was healthy enough to shoot him five times in front of a parking lot full of people; adults and children.
This is an aggravated case. There were five shots fired. Norris Payne was not armed. He was shot as he was trying to get away. The defendant went over there, walked up to the victim's car and confronted him and as he was trying to leave he shot him five times.
This affects the family greatly, but it also affects the community there in that apartment complex. There was a thirteen-year-old *102 boy who knew the defendant, was friends with his son that made the 911 call. A thirteen[-]year [-]old had to sit there and watch this man shoot somebody five times and he was there on the phone as Norris Payne was dying.
That entire community was affected so much so that the one and only reason we offered a lid of 12 years in this case is because people are afraid. When they see somebody who comes up and shoots somebody in cold blood five times in front of a crowd of people they are afraid to come to court. There were people that made statements at the time that the state worked diligently to locate. Everybody was afraid. People lied in depositions and came back and then told the truth. And the reason they did is because they were afraid of this man.
And part of the reason was he was out on bond. And I'm not saying I have evidence that there [were] direct threats from the defendant in this case. But when you see that kind of behavior in this kind of a circumstance an unarmed helpless man trying to leave shot 5 times people are afraid. They don't want to come to the court. They don't want to be labeled as snitches. They know he has family members in the community.
So this is an aggravated case and the health of the defendant is no defense whatsoever. And the fact that he comes in here and tries to justify what he did, that he went over there for a conversation is just appalling. Instead of getting up there and taking full responsibility he tries to justify his behavior in front of this family who is suffering the loss of a father, a son, a-I mean, Norris Payne has seven children ages five through nineteen. They're never going to see their father again. I think that Ms. Randle put it most powerfully when she described the thoughts and the feelings those kids must have at different events in their lifetimes. I can't say it any better than she did.
But I am just appalled at the testimony that the defendant gave today. I think that when you look at the SAR report and what the average sentence for this type of case is 22.9 years, it would be ideal for him to get the 12-year sentence. It was a gift from the state not because he deserves it, because of the evidentiary issues that we had. I'm asking for the 12 years and the 3 years. I think that's merited in this case and particularly after this testimony that we heard from the defendant today.
We've checked with the Department of Corrections. He can get his treatment there. There is not any issue [of] that. He was healthy enough to kill somebody in cold blood. He's healthy enough to go to prison and pay for it.
Duncan's counsel then argued, in part:
Now, we're not offering Mr. Duncan's health condition as a complete mitigating factor in this case, but this is not an aggravated case. This is a case where you heard his version of the events and he is not saying that he is [abdicating] responsibility in this case. He's accepted responsibility in this case.
So I generally agree with the state's position except on those issues. It's a tragic tragic event that happened, and I'm very sorry for their family. But Mr. Duncan also has a family who are present in the courtroom. So Mr. Duncan is not here offering his medical condition as some sort of mitigation for a complete mitigation for his actions, Your Honor. We're apprizing you for his medical condition, which is grave and that he's been on dialysis for five years. It is something that the Court really needs to know *103 about and to consider in the sentencing in this case.
The court sentenced Duncan to concurrent terms of twelve and three years' imprisonment, denying the requested probation. The court also addressed the effect of Duncan's health on its sentencing decision:
And I hope so sincerely, Mr. Duncan, that your health conditions can be taken care of while you are in the Missouri Department of Corrections. But justice has to be served in this case, and the 12 years is what the Court finds to be appropriate, and I know that means 85 percent. It's not lost on me.
I've spent a lot of time thinking about it, Mr. Duncan. It's not lost on me at all the significance of what's happening here. But I'm also looking at your background and your record and that comes into play too. But mostly Norris Payne is gone, and he's not here to take care of his children and for that justice has to be served. It's a tragic day, and I don't sit here and do this lightly, but it's appropriate and that's what we're-that's what is going to happen.
The court then addressed Duncan's rights under Rule 24.035 and questioned him about Counsel's services:
THE COURT: As it relates to Mr. Powell's services and the services of any attorney that's represented you since you were charged in this case, do you have any complaints of any kind with those services?
DEFENDANT DUNCAN: No, sir.
THE COURT: Do you believe that they have provided adequate counsel?
DEFENDANT DUNCAN: Yes, sir.
THE COURT: And as it relates to those issues, did he refuse to do anything you wanted to do?
DEFENDANT DUNCAN: No, sir.
THE COURT: Did he do anything that you didn't ask him to do that you didn't want him to do?
DEFENDANT DUNCAN: No, sir.
THE COURT: You understand this is the day to bring up any complaints if you have such complaints. Do you have any complaints?
DEFENDANT DUNCAN: No, sir.
Duncan filed a pro se Rule 24.035 motion, and appointed counsel filed an amended motion. In the amended motion, Duncan raised several claims. First, he argued that Counsel was ineffective for failing "to adequately investigate and present relevant and admissible evidence of Duncan's 'End-Stage Renal Disease ' to the trial, plea, and sentencing Court" and failing "to adequately explain to Duncan's treating physician the sentence which Duncan might face for the Murder 2 conviction, prior to asking Duncan's treating physician to draft an explanatory letter." Duncan claimed that, had Counsel "adequately presented this evidence to the Court and Duncan's treating physician, there is a reasonable probability that ... Duncan would have received a lesser sentence." Second, Duncan argued that his plea was involuntary and unknowing because Counsel misled Duncan into believing "that the plea agreement was for a 3-year ACA sentence and a suspended sentence on the Murder 2 charge and credit for time served while on bond (with house arrest monitoring as terms of the bond)." Duncan claimed that he "would not have entered a guilty plea if he had understood the full sentence he faced." Finally, Duncan argued that his twelve-year sentence for second-degree murder "constitute[d] Cruel and Unusual Punishment in violation of the Eighth and Fourteenth Amendments, and is an illegal sentence in excess of the maximum possible penalty under *104 Missouri law, in that the sentence results in 'torture or a lingering death.' "
The motion court held an evidentiary hearing, wherein it received testimony from both Duncan and Counsel. Following the hearing, the motion court entered findings of fact and conclusions of law, overruling Duncan's Rule 24.035 motion. Duncan appeals.
Standard of Review
"This Court's review of the denial of a post-conviction motion under Rule 24.035 is limited to a determination of whether the motion court's findings of fact and conclusions of law are clearly erroneous." Johnson v. State , 529 S.W.3d 36, 39 (Mo. App. W.D. 2017) (quoting Garris v. State , 389 S.W.3d 648, 650 (Mo. banc 2012) ). "The motion court's findings and conclusions are clearly erroneous only if, after review of the record, the appellate court is left with the definite and firm impression that a mistake has been made." Id. (quoting Garris , 389 S.W.3d at 650 ). "Movant has the burden to show by a preponderance of the evidence that the motion court clearly erred in its ruling." Id. (quoting Garris , 389 S.W.3d at 650-51 ).
Analysis
Duncan raises three claims on appeal. He argues that the motion court erred in denying his Rule 24.035 motion because: (1) his guilty pleas were unknowing and involuntary insofar as Counsel misled him regarding the severity of punishment and sentence he would receive; (2) Counsel provided ineffective assistance in failing to call Dr. Gerald Reid as a mitigation witness at sentencing to testify to the nature of Duncan's medical issues; and (3) Duncan's sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment insofar as Duncan's medical condition, in combination with his potential parole eligibility date, make it likely that he will die in prison. Because the motion court's findings and conclusions are not clearly erroneous, we affirm.
A. Duncan's claim that his plea was involuntary is refuted by the record.
In his first claim, Duncan argues that his plea was unknowing and involuntary because Counsel misled him regarding the severity of punishment he faced and the sentence he would receive. The motion court rejected this claim, finding that it was "refuted by the record and by the credible testimony presented at the evidentiary hearing." This finding is not clearly erroneous.
Duncan claims that "he pled guilty because of misapprehension and coercion." He specifically asserts that "[h]e firmly believed that the 12-year sentence for second degree murder was to be suspended," that "he was specifically promised probation on that count by plea counsel," and that he "was again promised by plea counsel that his time on house arrest would be credited to his sentence for armed criminal action." Duncan concludes that "[a]ll of these factors rendered his guilty plea coerced and unknowing, and therefore involuntary."
"Mistaken beliefs about sentencing affect a defendant's ability to knowingly enter a guilty plea if the mistake is reasonable and the mistake is based upon a positive representation upon which the movant is entitled to rely." Dobbins v. State , 187 S.W.3d 865, 866 (Mo. banc 2006). "If a defendant is misled or induced to enter a plea of guilty by fraud, mistake, misapprehension, coercion, duress or fear, then the defendant should be permitted to withdraw the plea." Id. at 867.
"When a movant claims that he pleaded guilty due to a mistaken belief *105 about the sentence, the test is whether a reasonable basis existed in the record for that belief." Briley v. State , 464 S.W.3d 537, 542 (Mo. App. E.D. 2015). "[W]here there is no reasonable basis for the movant's belief in light of the guilty plea record, the movant is not entitled to relief." Rivers v. State , 498 S.W.3d 534, 537 (Mo. App. E.D. 2016) (quoting Kennell v. State , 209 S.W.3d 504, 508 (Mo. App. E.D. 2006) ). "Neither a disappointed expectation of a lesser sentence, nor a mere prediction as to sentencing by counsel that proves incorrect, is sufficient to render a guilty plea involuntary." Id. (quoting Lynn v. State , 417 S.W.3d 789, 801 (Mo. App. E.D. 2013) ).
Here, Counsel testified at the evidentiary hearing that he made no such representations or promises to Duncan regarding his sentence:
Q. Just so it's clear, you never promised Bryan Duncan that he was going to receive probation for a murder 2?
A. I personally never promised him that at all, no.
Q. And you never promised Bryan that he would receive credit for time served while on house arrest?
A. I'm not in a position to promise either one of those things.... So the answer is no. I'm sorry. No.
The motion court expressly credited Counsel's testimony, noting that "the credible testimony of [Counsel] at the evidentiary hearing established that [Counsel] never promised [Duncan] that he would receive probation for murder." "[A]t the evidentiary hearing, '[t]he motion court is free to believe or disbelieve any portion of the testimony and we defer to the motion court's credibility determinations.' " Johnson , 529 S.W.3d at 41 (quoting Cross v. State , 454 S.W.3d 365, 368-69 (Mo. App. S.D. 2015) ).
But, even if the motion court had not expressly credited Counsel's testimony refuting Duncan's claim, he still would not be entitled to relief, as the guilty plea record shows that there was no reasonable basis for Duncan's claimed belief that he would receive probation or credit for time served on house arrest. As the motion court found, "[Duncan's] statements made during the guilty plea indicate that he fully understood the plea agreement and was aware that the State would be allowed to ask for any number of years allowed under the lid recommendation." "On multiple occasions, on the record, the nature of the plea agreement between the State and [Duncan] was explained and [Duncan] acknowledged understanding it." "In the present case, the record clearly refutes Duncan's claims that he was promised probation on the murder charge." These findings are not clearly erroneous.
Duncan's first claim is denied.[6]
B. Duncan cannot claim, for the first time on appeal, that the absence of mitigation testimony at sentencing affected the voluntariness of his guilty pleas.
In his second claim, Duncan argues that Counsel was ineffective in failing to call Dr. Gerald Reid (Duncan's treating physician for renal failure ) at sentencing to testify to the serious nature of Duncan's *106 health condition in mitigation of a lengthy sentence. Duncan claims that he would not have pled guilty if he had known that Dr. Reid would not be called to testify at sentencing.
At the outset, we are compelled to point out that Duncan's claim on appeal differs from that raised in his amended motion. Specifically, Duncan did not claim-as he does on appeal-that the absence of Dr. Reid's testimony at sentencing affected the voluntariness of his plea. Rather, in his amended motion, Duncan challenged the absence of Dr. Reid's testimony as affecting only the outcome of his sentencing hearing. Specifically, he claimed that, "[h]ad [Counsel] adequately presented this evidence to the Court ..., there is a reasonable probability that, but for [Counsel's] error ..., Duncan would have received a lesser sentence."[7]
"[T]he Strickland[8 ] prejudice prong permits a defendant to argue prejudice in sentencing as a result of ineffective assistance of counsel without requesting vacation of the underlying guilty plea or finding of guilt." Cherco v. State , 309 S.W.3d 819, 829-30 (Mo. App. W.D. 2010).
If a defendant aggrieved by ineffective assistance of counsel at sentencing is willing to abide by the guilty plea or conviction , the defendant nonetheless may have recourse under a post-conviction motion if the defendant demonstrates there is a reasonable probability that sentencing was influenced by ineffective assistance of counsel during sentencing.
Id. at 830 (emphasis added). "A motion court is permitted to vacate a sentence without vacating a conviction if prejudice in the sentencing phase is shown." Id. By not claiming below that Counsel's alleged error at sentencing affected the voluntariness of his guilty plea, Duncan could not properly seek relief in the form of vacation of his pleas. But, now on appeal, Duncan is claiming for the first time that the absence of Dr. Reid's testimony affected the voluntariness of his pleas and asks this court to vacate his guilty pleas as a result. This we cannot do.
"Claims not raised in a motion for post-conviction relief are deemed waived and cannot be reviewed on appeal." Tisius v. State , 519 S.W.3d 413, 431 (Mo. banc 2017). "Pleading defects cannot be remedied by the presentation of evidence and refinement of a claim on appeal." Id. (quoting Mallow v. State , 439 S.W.3d 764, 769 (Mo. banc 2014) ). Accordingly, we will not consider Duncan's claim that Counsel's decision not to call Dr. Reid as a witness affected the voluntariness of Duncan's guilty plea.
But, even considering Duncan's allegation of prejudice as pled in the amended motion (that he would have received a lesser sentence), his claim still does not warrant relief in the form of vacating his sentences.[9]
"To be entitled to post-conviction relief for ineffective assistance of counsel, a movant must show by a preponderance of the evidence that his or her trial counsel failed *107 to meet the Strickland test in order to prove his or her claims." Mallow , 439 S.W.3d at 768. "Under Strickland , a movant must demonstrate that: (1) his or her counsel failed to exercise the level of skill and diligence that a reasonably competent counsel would in a similar situation, and (2) he or she was prejudiced by that failure." Id. at 768-69.
"A movant must overcome the strong presumption that counsel's conduct was reasonable and effective." Id. at 769. "To overcome this presumption, a movant must identify 'specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance.' " Id. (quoting Zink v. State , 278 S.W.3d 170, 176 (Mo. banc 2009) ). "Trial strategy decisions may be a basis for ineffective counsel only if that decision was unreasonable." Id. "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable[.]" Id. (quoting Anderson v. State , 196 S.W.3d 28, 33 (Mo. banc 2006) ).
"To establish relief under Strickland, a movant must prove prejudice." Id. "Prejudice occurs when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " Id. (quoting Deck v. State , 68 S.W.3d 418, 429 (Mo. banc 2002) ). As mentioned above, in the context of claimed deficient performance at sentencing, a movant demonstrates prejudice by showing that he would have received a lesser sentence in the absence of counsel's alleged errors. Cherco , 309 S.W.3d at 829-30.
To begin, Duncan's claim is again unsupported by the record at the sentencing hearing. At sentencing, after the court pronounced sentence without having received any testimony from Dr. Reid , Duncan expressly denied having any complaints or criticisms of Counsel, and he specifically denied that Counsel failed to do anything he wished Counsel to have done.
At the evidentiary hearing, Counsel's testimony indicated that he strategically chose not to put on any more evidence of Duncan's health condition, as it was his belief that the court was already fully aware of the seriousness and did not need any further information:
Q. At sentencing did you present further evidence of the Defendant's medical condition to the Court?
A. We did. The Court was aware of his medical condition because of the bond conditions. He was aware at my recollection-and I haven't poured through the transcripts because I don't have them. But at plea the judge even was aware that he was in renal failure.
And, at sentencing, we did provide the Court with some additional medical evidence of that in the form of a couple of letters from his nephrologist and the dialysis center where he was receiving ongoing treatment.
...
Q. Can you explain to the Court what your reasoning was behind not presenting further medical testimony in this case?
A. If I believed in any way that Judge McKenzie wasn't aware of Mr. Duncan's medical condition, then I would have called in doctors and let them know-let them testify as to such.
I believe that the judge was well aware of the condition even before he took the plea. So we got letters and put those into evidence to support our position that Mr. Duncan was in a precarious health condition.
But as far as a decision on whether or not to subpoena a nephrologist and bring them in to give testimony on *108 that, we didn't do it because we didn't think it was necessary at that time because the judge was aware of his condition and the import of it.
Counsel further indicated that Duncan's medical problems presented "a bit of a touchy situation, because we didn't want to appear like his medical condition was mitigating for his actions, but that was something the Court should take into account in the sentence." Counsel testified, "I presumed that the Court understood the import of the decision it was making; it was aware of his medical condition."[10]
"Counsel's presentation of sentencing phase evidence is a matter of professional judgment." Washington v. State , 415 S.W.3d 789, 794 (Mo. App. E.D. 2013). "Whether that judgment is effective or ineffective is measured by whether the advocacy was reasonable under the circumstances, not by the sentence the defendant receives." Id. (quoting Antwine v. State , 791 S.W.2d 403, 407 (Mo. banc 1990) ). "Counsel's decision not to call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise." Id. at 794-95 (quoting Hutchison v. State , 150 S.W.3d 292, 304 (Mo. banc 2004), abrogated on other grounds by Mallow , 439 S.W.3d at 770, n.3 ).
Here, Duncan has not clearly demonstrated that Counsel's strategy was unreasonable. But, in any event, "[t]o establish prejudice for an alleged error during the sentencing phase of trial, a movant must show that but for counsel's deficient performance, there is a reasonable probability that he would have received a lesser sentence." Id. And that is not a claim Duncan has raised on appeal. Because it is Duncan's burden to demonstrate both deficient performance and resulting prejudice, and he has abandoned the only claim of prejudice he raised below, he simply cannot meet his burden.
Duncan's second claim on appeal is denied.
C. Duncan's sentence does not violate the Eighth Amendment.
In his final claim, Duncan argues that his twelve-year sentence for second-degree murder violates the Eighth Amendment insofar as the combination of his medical condition with his parole eligibility date increases the chances that he will die in prison and renders his sentence a de facto death sentence. The motion court rejected Duncan's claim, noting first that Duncan's sentence "was twelve years-not a death sentence. " (Emphasis in original.) The motion court then determined that "[t]he consequence of a twelve[-]year sentence resulting in a 'very high risk of mortality' does not legally transform the sentencing court's twelve[-]year sentence to a death sentence." The motion court pointed out the absence of any authority "suggesting that this mortality risk or any other natural adverse consequence of the court's sentence is properly analyzed under the Eighth Amendment." The motion court then identified "multiple adverse consequences to serving prison sentences," such as people losing their homes, spouses through divorce, or custody of their children. The motion court suggested that, "[u]nfortunately, others die" but recognized that "these are all consequences of the prison term, not the sentence imposed by the courts." The motion court then noted that it was "limited to determining *109 whether a twelve[-]year sentence for murder is cruel and unusual punishment under Missouri law" and concluded that it was not. This determination was not clearly erroneous.
"[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions." State v. Denzmore , 436 S.W.3d 635, 644 (Mo. App. E.D. 2014) (quoting Roper v. Simmons , 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ). "Embodied in the Constitution's ban on cruel and unusual punishments is the precept of justice that punishment for crime should be graduated and proportioned to the offense." Id. (quoting Graham v. Florida , 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) ). "Proportionality 'does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime.' " Id. (quoting Graham , 560 U.S. at 60, 130 S.Ct. 2011 ). "Gross disproportionality will be found only in exceedingly rare and extreme cases." Id. (quoting Burnett v. State , 311 S.W.3d 810, 814 (Mo. App. E.D. 2009) (internal quotations omitted)). "A sentence within the range prescribed by statute generally will not be found excessive, or grossly disproportionate, to the crime committed." Id. (quoting Burnett , 311 S.W.3d at 815 ). Additionally, "[r]equiring inmates to serve a mandatory minimum percent of their sentence is not inherently unconstitutional." Willbanks v. Dep't of Corr. , 522 S.W.3d 238, 242 (Mo. banc 2017), cert. denied sub nom. Willbanks v. Mo. Dep't of Corr. , --- U.S. ----, 138 S.Ct. 304, 199 L.Ed.2d 125 (2017).
Duncan's sentence of twelve years is well within the applicable range of punishment for second-degree murder. "[M]urder in the second degree is a class A felony," for which the authorized term of imprisonment is "a term of years not less than ten years and not to exceed thirty years, or life imprisonment." §§ 565.021.2 and 558.011.1(1). Thus, a sentence of twelve years is on the lower end of the spectrum. Additionally, as noted in the Sentencing Assessment Report, the average sentence for Duncan's crime is 22.9 years, considerably greater than the twelve-year sentence he received.
Duncan argues that, due to the serious nature of his renal failure, he will die in prison as a result of this sentence. The entire basis for this assertion is predicated upon several assumptions: (1) Duncan must have a kidney transplant to survive; (2) he would have received a transplant if required to serve only his three-year ACA sentence; (3) he will not receive a transplant while serving his twelve-year murder sentence. Though Duncan offered evidence to support the first of these assumptions, he provided no evidence to support either the second or third. Attached to his amended motion was a letter from Dr. Reid indicating that "Bryan has previously been activated on the Kidney Transplant List but in his current situation is unable to get a kidney transplant." The letter does not explain what it is about his "current situation" that precludes the kidney transplant or how those situational factors would differ under a different sentence for second-degree murder. Duncan did not present any evidence regarding qualifications for remaining on the Kidney Transplant List; thus, it is impossible for us to discern whether a different sentence would have produced a different result. It may very well be that he was removed for some other reason, unrelated to the twelve-year sentence. See, e.g., E. Bernadette McKinney, William J. Winslade, & T. Howard Stone, Offender Organ Transplants: Law, *110 Ethics, Economics, and Health Policy , 9 Hous. J. Health L. & Policy 39, 46 (2009) (identifying a variety of reasons an offender may become ineligible).[11] Accordingly, even if a de facto death sentence could be held, under these circumstances, to violate the Eighth Amendment (and we do not so hold), Duncan failed to prove that his twelve-year sentence constituted a de facto death sentence.
Duncan's third claim on appeal is denied.
Conclusion
The motion court did not clearly err in overruling Duncan's Rule 24.035 motion. Its judgment is affirmed.
Thomas H. Newton, Presiding Judge, and Victor C. Howard, Judge, concur.

These exhibits have not been filed as part of the appeal. "Rule 81.12 imposes a duty on appellants to file a legal file with all records necessary for review. We are entitled to presume that omitted portions of the record are unfavorable to the appellant and favorable to the trial court's decision." State v. Richter , 504 S.W.3d 205, 208 n.3 (Mo. App. W.D. 2016) (quoting Long v. State , 441 S.W.3d 154, 159 n.6 (Mo. App. E.D. 2014) ).

Furthermore, even though Duncan alleged in his amended motion that he would not have pled guilty if he had fully understood the sentence he was facing, he did not reiterate this claim in his brief. "To establish prejudice, [a] movant must show that a reasonable probability existed that, but for counsel's error, [the] movant would not have pleaded guilty but would have proceeded to trial." Carbaugh v. State , 348 S.W.3d 871, 877 (Mo. App. S.D. 2011). Thus, because he failed to argue any resulting prejudice in his brief, Duncan's claim was doomed at the outset.

It appears that Duncan altered his claim as a result of the motion court's conclusion that Duncan failed to demonstrate that "the failure to present medical testimony affected the voluntariness of his plea."

Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

It is also worth noting that, in the amended motion, Duncan argued that Counsel was ineffective for failing to investigate and for presenting misleading evidence of Duncan's health condition. Neither of these claims has been asserted in the brief and, therefore, they are deemed abandoned. Midgyett v. State , 392 S.W.3d 8, 12 (Mo. App. W.D. 2012).

Counsel's belief in the court's awareness of Duncan's health condition was accurate. The court made it clear at sentencing when the court noted, "It's not lost on me at all the significance of what's happening here."

McKinney, Winslade, and Stone note:
Many offenders who suffer from organ-damaging disorders will be ineligible for placement on a transplant list. Some will achieve health stability without intervention. Some will not have organ damage sufficient to justify further evaluation for transplantation. Some with serious organ damage will not qualify medically for placement on a transplant list (e.g., due to other illnesses, substance abuse, inability to comply with treatment). Furthermore, offenders may be released or die before reaching the top of the priority list. They may lose eligibility due to threats to compliance (e.g., drug abuse) or for other medical reasons. Under new regulations, transplant centers will be evaluated based on the number of transplants they perform, the survival rate of the organs transplanted after one year, and the survival rate of the organ recipients after one year. The potential threats to success with transplants in offenders may discourage transplant centers from giving priority to offenders listed for transplants out of fear of losing transplant-center status.
9 Hous. J. Health L. & Pol'y at 46 (internal footnote omitted).