

# In the
# Missouri Court of Appeals
# Western District

JAYLEN JAMES,                                 )
                                              )
                  Appellant,                  )
                                              )        **WD85640**
        v.                                    )        **OPINION FILED:**
                                              )        **NOVEMBER 7, 2023**
STATE OF MISSOURI,                            )
                                              )
                  Respondent.                 )

### Appeal from the Circuit Court of Boone County, Missouri
### The Honorable Jonathan Hasbrouck Jacobs, Judge

### Before Division One: Edward R. Ardini, Jr., Presiding Judge, Anthony Rex Gabbert, Judge, Thomas N. Chapman, Judge

Jaylen James appeals the circuit court's denial of his Rule 24.035 motion for post-conviction relief following an evidentiary hearing. James contends that, to his prejudice, the motion court, 1) clearly erred in finding that no prosecutorial misconduct occurred, 2) clearly erred in finding that James's sentence was not disproportionate to those of his co-defendants in violation of James's right against cruel and unusual punishment, and 3) clearly erred in finding that James's counsel was not ineffective in failing to present available evidence at sentencing. We affirm.

## Background and Procedural Information

*Probable Cause Statement*

On February 27, 2019, a probable cause statement was filed with the circuit court alleging that Jaylen D. James had committed robbery in the first degree, pursuant to Section 570.023, and/or burglary in the first degree, pursuant to Section 569.160.[1] The Statement alleged that at 3:14 a.m. on January 28, 2019, officers were dispatched to a home invasion robbery at an apartment on Aspen Heights Parkway in Columbia, Missouri. Upon arrival, officers contacted victims J.L., J.H., and K.S. Victim K.S. stated she fell asleep in her bed when a black male suspect with a red bandana over his face woke her up and pointed a handgun at her. The suspect made her get out of bed, pointed the gun at her head, and told her to walk to the room where victims J.L. and J.H. were in bed. The suspect told K.S. to get in the bed with J.L. and J.H. A second suspect was in the room with J.L. and J.H., pointing a handgun at them.

J.H. told officers that the suspects were demanding to know where the guns were. J.H. told them there were no guns in the residence. J.H. stated the suspects then demanded money and drugs. J.H. told the suspects where his cash was. The suspects stole $5,000 in cash, J.H.'s white PlayStation 4, and a black PS4 controller. The suspects then fled.

---

[1] All statutory references are to the Revised Statutes of Missouri, as updated through 2018, unless otherwise noted.

J.H. and J.L. reported believing that Jaylen James might have planned the robbery due to a December 15, 2018, shooting incident wherein James accidentally shot J.L. inside their residence. Officers responded to that incident. The victims reported that, James was a convicted felon and was not supposed to possess firearms. J.H., J.L., and James initially falsified their statements to the police so James would not be arrested, however J.H. and J.L. eventually told police that James was the person who shot J.L. and that James hid the firearms in the attic. James believed that J.H. and J.L. took the firearms thereafter.

J.H. and J.L. stated they knew James was not one of the home invasion suspects because they would have recognized his voice. However, they believed James put the others up to the robbery since the suspects were demanding to know where the guns were.

On February 6, 2019, officers were dispatched to a disturbance at an apartment complex in Columbia. A victim, E.S., reported being assaulted by her boyfriend, Jamieon Parker. During the investigation, E.S. stated that Parker lived with David Galentine. E.S. also stated that she was friends with James and two of the victims of the home invasion, J.H. and J.L.

E.S. stated that she was not aware J.H. and J.L. had been robbed until a few nights prior when J.H. told E.S. the details of the robbery. E.S. recalled being at Parker and Galentine's apartment when the robbery occurred. E.S. stated that at approximately three in the morning on January 28, 2019, Parker and Galentine left the residence dressed in all

3

black clothing. They returned about an hour later with $4,800 in cash and a white PlayStation 4. James arrived at the apartment a short time later. Parker and Galentine gave James $1,000. E.S. believed they had just robbed someone, but she did not know who at the time.

On February 8, 2019, at 2:45 p.m., a search warrant was served at Parker and Galentine's apartment. Evidence from the robbery was located at the residence, including J.H.'s PlayStation and firearms. Parker and Galentine were later questioned. Both confessed to their involvement in the crimes. Both additionally reported that James helped plan the robbery and received part of the money that was stolen.

*Grand Jury Indictment*

On July 26, 2019, a Grand Jury indicted James of the class A felony of robbery in the first degree pursuant to Section 570.023, alleging that James, acting in concert with another, forcibly stole US currency and a PlayStation 4, owned by J.H., and in the course thereof displayed what appeared to be a deadly weapon. James was also indicted on the class B felony of burglary in the first degree pursuant to Section 569.160, under the allegation that James, acting in concert with others, knowingly entered unlawfully an inhabitable structure for the purpose of committing robbery therein, with one participant in the crime armed with a deadly weapon.

*Information in Lieu of Indictment*

On January 21, 2021, the State moved to file an Information in Lieu of Indictment which reiterated the prior charges and also alleged that James was a prior and persistent

offender.  The Information alleged that, on or about July 18, 2018, James was found guilty of the felony of resisting arrest for events that occurred on May 2, 2018, found guilty of the felony of delivery of a controlled substance for events that occurred on March 25, 2018, and found guilty of the felony of unlawful use of a weapon for events that occurred on March 25, 2018.

*Plea Hearing*

On March 1, 2021, the court granted the State's request to file an amended Information in Lieu of Indictment, and a plea hearing was held on James's charges that same date.  At the hearing, the court asked if there were any terms related to the plea, and the State indicated that it was lowering the robbery charge to conspiracy to commit robbery -- a class B felony with the range of punishment five to fifteen years.  Further, the State was dismissing the burglary charge.  The plea was to be open, with punishment determined by the court.  Each side would be free to make recommendations, but a Sentencing Assessment Report would be needed before recommendations could be made.

James expressed a desire to plead guilty to the reduced charge.  James stated that he understood the court would not sentence him that day, that he would return later for sentencing, and that the court could send him to prison for fifteen years.  James acknowledged that on January 28, 2019, with the purpose of promoting or facilitating the offense of robbery in the first degree, he agreed with David Galentine and Jamieon Parker that one or more of them would enter an apartment located at Aspen Heights Parkway and rob the inhabitants of money.  James further acknowledged that David Galentine

5

and/or Jamieon Parker entered that residence without permission, displayed what appeared to be a deadly weapon, and demanded money.

James stated that he was pleading guilty to the charges because he was actually guilty. The court explained that, prior to sentencing, it would review a Sentencing Assessment Report that would inform the court of both good and bad things about James, and the report would play a role in how the court would sentence James. James indicated that he understood. James also understood that the court would listen to what James's lawyer recommended with regard to sentencing, listen to what the prosecutor recommended regarding sentencing, consider the testimony of witnesses, and then make a final decision. James understood that if the court decided to do something different than what James and his lawyer wanted, James would not be released from his plea. The court reiterated that James could be sent to prison for fifteen years, and James indicated that he understood and still wanted to plead guilty.

James indicated at the plea hearing that, other than what had been discussed in court by the judge, no one had promised James anything in exchange for his guilty plea. The court noted a pending 2018 case and asked if there was any agreement on that case as a result of James pleading guilty to the case before the court. The State indicated that James had asked if they could wait to see what would happen in the case before the court before finalizing the other case. The State indicated that the other case involved James allegedly "toying around with a gun and accidentally discharging it and striking somebody." They all believed it was a less serious case and agreed to postpone that case

6

until sentencing on the case before the court. The court then explained to James that it could sentence James to fifteen years on the case before the court, and the State could "turn around and try you on that other case and I could max you out on that other case." James stated that he understood and still wanted to plead guilty. James acknowledged that his attorney could give him advice but that the decision to plead guilty or go to trial could only be made by James.

The court found James's plea of guilty entered freely and voluntarily with an understanding of the nature of charge, range of punishment, and the consequences thereof.

*Sentencing Hearing*

On April 12. 2021, James appeared before the court for sentencing. Prior to sentencing, the court received and reviewed a Sentencing Assessment Report related to James. The report stated that James acknowledged that he told his two co-defendants where to find the victim, fully knowing what his co-defendants intended to do. James had prior felony convictions in 2018 in Cole County for resisting/interfering with arrest (for which he received a four-year sentence, with suspended execution and five years' probation), delivery of thirty-five grams or less of marijuana or synthetic cannabinoid (for which he received a four-year sentence, with suspended execution and five years' probation), and unlawful use of a weapon (for which he received a four-year sentence, with suspended execution and five years' probation). James had pending charges in Boone County for unlawful possession of a firearm, second-degree assault, armed

7

criminal action, and tampering with physical evidence. He may have had additional pending charges in Cole County.

At the sentencing hearing, the State recommended James receive the maximum penalty of fifteen years in prison. The State argued that, although James was not present at the scene of the robbery, he masterminded a very scary robbery involving weapons. James knew the victims and advised Parker and Galentine where the victims lived and that the victims had a considerable amount of cash in the home. The victims, including a seventeen-year-old girl, were held at gunpoint while cash and other valuables were stolen. The State argued that James received $1,000 from the robbery. At the time James orchestrated the robbery, he was on felony probation in Cole County for distribution of drugs, exhibiting a weapon in an angry or threatening manner, and resisting arrest.

James's counsel suggested a ten-year suspended sentence with probation. Counsel argued that James was not at the scene of the robbery and received very little money from the robbery. He contended that there was a huge difference between going into a home with firearms and robbing people in the middle of the night, and simply advising other people of a resource for doing that and accepting some of the proceeds. Counsel argued that, in the two years following the robbery and while James was out on bond, his life had changed significantly as he had married and had a child. James had also completed substance abuse counseling and maintained steady employment until he quit to focus on family and court appearances.

James's counsel argued that the State had no proof that James was the ringleader of the robbery, and the State could have brought Galentine and Parker in to testify but did not. The court asked what happened to Galentine and Parker. James's counsel stated, "They pled guilty…. So I think they're awaiting sentencing, if I'm not mistaken." The State added, "Correct."

James personally spoke to the court and indicated that he was sorry for taking part in the crime because it was not just a random person he targeted, but someone he grew up with, went to school with, and still had a good relationship with. He stated that he had learned a lot since then, had become a hard worker and a manager at a restaurant, and had started a family. He stated that he had committed no criminal offenses while out on bond.

Victim J.H. who had his cash and PlayStation stolen spoke to the court. He indicated that he had spoken with James and did not believe James should be sentenced to fifteen years. He stated that he and James grew up together, they both now have children of their own, and he expected their children to grow up together.

The court sentenced James to twelve years in the Department of Corrections. The court stated that, even if this was James's only case, it would have still been a "tall order for me to give you probation under those circumstances." The court gave James credit for any time served, stated that it presumed James would be eligible for parole at some point, but given everything before the court, twelve years was the necessary sentence.

9

*Post-Conviction Relief Proceedings*

On October 6, 2021, James filed a Rule 24.035 motion for post-conviction relief contending that, 1) his sentence violated his rights to due process of law and to be free from cruel and unusual punishment because it was disproportionate to those of his co-defendants and was the result of prosecutorial misconduct, 2) he was denied effective assistance of counsel at sentencing because significant information was not presented to the sentencing judge, and 3) he was denied effective assistance of counsel at sentencing when counsel failed to learn that James's co-defendant, Jamieon Parker, had been sentenced to probation the morning before James was sentenced in the afternoon, and present to the court that Parker received probation. On February 2, 2022, James filed an amended motion setting forth the same claims.

On May 20, 2022, an evidentiary hearing was held on James's motion. Evidence presented at that hearing will be set forth below as relevant to James's claims on appeal.

On July 26, 2022, the motion court entered judgment denying James's Rule 24.035 motion. The court discussed each of James's claims in detail, but summarized its denial of all claims stating that, even if the court had considered at sentencing all of the information presented at the evidentiary hearing, James's sentence would not have changed. The court noted that, at the time James committed the charged conspiracy to commit robbery, he was already on probation for three felonies. The court stated that, probation was not appropriate in the case, and a sentence less than twelve years was not appropriate. The court additionally noted that, after sentencing in the case, James pled

10

guilty to three other felonies for acts occurring prior to the sentencing and those were not considered by the court since the convictions occurred after sentencing. The court concluded that, "A sentence of twelve years, which is three less than the maximum sentence in this case, is the appropriate sentence, even with this Court considering everything that has been presented to it."

This appeal follows.

## Standard of Review

Appellate review of the denial of a post-conviction motion under Rule 24.035 is limited to a determination of whether the motion court's findings of fact and conclusions of law are clearly erroneous. *Roberts v. State*, 276 S.W.3d 833, 835 (Mo. banc 2009); Rule 24.035(k). "The motion court's findings and conclusions are clearly erroneous only if, after review of the record, the appellate court is left with the definite and firm impression that a mistake has been made." *Roberts*, 276 S.W.3d at 835. Movant has the burden of proof by a preponderance of the evidence that the motion court erred in its ruling. *Id.*; Rule 24.035(i). When reviewing a motion court's ruling, we presume the motion court's findings are correct. *Simmons v. State*, 100 S.W.3d 143, 145 (Mo. App. 2003).

"[James] must satisfy the two-pronged *Strickland* test to meet his burden: (1) that counsel's performance did not conform to the degree of skill, care and diligence of a reasonably competent attorney; and (2) that [James] was thereby prejudiced." *Haskett v. State*, 152 S.W.3d 906, 909 (Mo. App. 2005) (*citing Bucklew v. State*, 38 S.W.3d 395, 397 (Mo. banc 2001); *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The performance

11

prong requires an objective standard of reasonableness, viewed in light of all the circumstances. *Pittman v. State*, 331 S.W.3d 361, 364 (Mo. App. 2011). "In order to establish *Strickland's* prejudice prong in a claim of ineffective assistance of counsel at sentencing, a movant must demonstrate that, but for trial counsel's unprofessional errors, a reasonable probability exists that movant would have received a lesser sentence." *Jones v. State*, 631 S.W.3d 682, 689 (Mo. App. 2021). If either the performance prong or the prejudice prong fails, then the court need not consider the other, and James's claim of ineffective assistance of counsel fails. *See Strickland*, 466 U.S. at 687. Counsel is presumed to have rendered adequate assistance and to have made all significant decisions in reasonable professional judgment. *Pittman*, 331 S.W.3d at 364 (*citing Strickland*, 466 U.S. at 689).

### Point I – Prosecutorial Misconduct at Sentencing

In James's first point on appeal, he contends the motion court clearly erred in finding that no prosecutorial misconduct occurred when the prosecutor lied to the trial court at sentencing, arguing that due process of law requires the prosecutor be candid with the tribunal and, had the misconduct not occurred, there is a reasonable probability of a different outcome at sentencing. He additionally argues that the prosecutor misrepresented to trial counsel that he would make the same sentencing recommendation for James and his co-defendants, but did not.

James's plea/sentencing counsel testified at James's evidentiary hearing. Counsel testified that plea negotiations involved pursuing a reduction in the charges so that James

12

would not have to serve a mandatory 85% of any given prison term. The prosecutor's first offer to reduce the charge and plead to fifteen years was rejected by James. Closer to the trial date, Counsel asked the State to consider another offer and the prosecutor stated that he would agree to ten years. James declined that offer because he wanted Counsel to argue for probation, and James thought it would be better to enter an open plea and let the court decide punishment so that Counsel could argue for probation. The State was approached with the offer of an open plea, which the prosecutor did not initially like but ultimately agreed to. Counsel testified that the prosecutor stated that he would make the same deal with the other two defendants, and that he would be arguing for fifteen years on all three defendants. Counsel stated that this was important to James, because James wanted to make sure he was not going to be treated differently than his co-defendants.

Counsel additionally testified that, at the time of James's sentencing, Counsel did not believe the other two defendants had been sentenced. He believed this because the prosecutor had stated that he wanted James's sentencing to go first to determine what he was going to receive, and the other two defendants were being held as witnesses on James's case. "So even if he pled, I was not under the impression that those two individuals were going to be sentenced before Mr. James." Counsel testified that, at James's sentencing hearing when the court asked Counsel what happened to the other two defendants, Counsel reported that they pled guilty and were under agreement with the State to testify, "So I think they're awaiting sentencing, if I'm not mistaken." The

13

prosecutor stated, "Correct." Counsel testified that this statement by the prosecutor was another reason he believed the co-defendants had not been sentenced.

Counsel testified that he later found out that one of the defendants had been sentenced a few hours before James and that the prosecutor had lied. Counsel testified that, additionally, the State essentially made no recommendation as to Parker's sentence and Parker was sentenced to ten years with a suspended execution of sentence and placed on probation. Had Counsel known that Parker was sentenced to probation, his strategy at the sentencing hearing would have changed. He would have distinguished between James and the defendant willing to put on a ski mask and jump through a window and terrorize people in the middle of the night for gain. Counsel believed that the State accepting probation in Parker's case and arguing for fifteen years in James's case was "disingenuous" and had "no credibility whatsoever." Counsel would have compared the State's position in the cases at James's sentencing and argued that the State's sentencing argument in James's case was ridiculous.

In denying this claim, the motion court found that James's primary allegation of misconduct was when the prosecutor answered "Correct" when James's counsel stated that he thought the co-defendants were awaiting sentencing. The motion court found that the prosecutor made a "factual misstatement" with regard to co-defendant Parker who had been sentenced earlier that morning, although was correct as to Galentine not yet being sentenced. The court found it "more likely that [the prosecutor] merely misheard what was said by opposing counsel, who only mentioned by name Galentine, the co-

14

defendant who had not been sentenced yet." The court concluded that James failed to prove the prosecutor intentionally lied to mislead anyone or gain a perceived advantage. The court additionally stated that it was merely curious as to what happened to the other defendants when asking the question, but the answer would not have impacted the court's decision regarding James's sentence. The court stated that probation would not have been granted regardless of what happened in the co-defendants' cases, and the twelve-year sentence was appropriate for James.

With regard to James's contention that his due process rights were violated when the prosecutor allegedly told plea counsel that he would make the same recommendation in all three cases but did not, the motion court found that all three cases were open pleas as promised by the prosecutor, and even if the prosecutor softened his stance at sentencing in the co-defendants' cases, that did not affect the voluntariness of James's plea.

We find no clear error. It is significant in this case that the same judge presided over James's plea hearing, sentencing hearing, and post-conviction proceedings. When the sentencing court and motion court are one in the same, the motion court's findings "carry special weight." *Dawson v. State*, 611 S.W.3d 761, 767 (Mo. App. 2020). We are cognizant, however, that the prejudice inquiry "should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern that decision." *Strickland*, 644 U.S. at 695, 104 S.Ct. 2052.

Here, the motion court judge presided over James's sentencing where the prosecutor made a factual misstatement as to a co-defendant's sentencing status, but deemed that misstatement to have not been purposeful or designed to mislead the court to gain an advantage. The judge expressed that his own question regarding the other two defendants was asked out of curiosity, and the court having knowledge of the sentencing decisions in the other cases would not have impacted James's sentence. The judge stated that this was primarily because the judge would have been unaware of any additional facts and details surrounding those sentences.

The court provided sound reasons why a twelve-year sentence was reasonable in James's case. Specifically, James was on felony probation for three different serious felony offenses at the time he committed the conspiracy to commit robbery. One prior conviction involved an attempt to deliver a controlled substance. In another, James knowingly exhibited, in the presence of others, a semi-automatic weapon with an extended magazine, a weapon readily capable of lethal use, in an angry or threatening manner. In the other felony conviction, James fled from an officer who was attempting to make a lawful stop. He fled in such a manner that created a substantial risk of serious physical injury or death to other persons by operating a motor vehicle in excess of 100 miles per hour, failed to stop for solid red lights, and failed to stop at stop signs.

Given the record, we find no clear error in the motion court's determination that James's sentence of twelve years was reasonable and that the prosecutor's misstatement did not create a reasonable probability of a different outcome at sentencing. Likewise,

16

we find no clear error in the court's conclusion that James's plea was knowing and voluntary despite the prosecutor allegedly telling James's plea counsel that he would be recommending fifteen years for the co-defendants' sentences. James acknowledged at his plea hearing that he understood the court could sentence him to the maximum of fifteen years in prison. James also averred that no promises had been made to him by anyone that induced him to plead guilty.

Point I is denied.

## Point II – Disproportionate Sentence

In his second point on appeal, James contends the circuit court clearly erred in finding that James's sentence was not disproportionate to those of his co-defendants in violation of James's right against cruel and unusual punishment. James argues that he was "not the actual perpetrator" and did not have a substantially different criminal history than Parker who received probation. He argues that Parker was on probation when he committed the crime and, by the time Parker entered his guilty plea, his probation had been revoked and he was in prison.

James argues that Parker's and Galentine's role in the crime was far more serious that his own, in that they entered a home in the middle of the night, held occupants by gunpoint, and stole cash and belongings. He contends that he is not suggesting that probation was appropriate for him just because his co-defendants received probation, and acknowledges that the court considered the co-defendants' cooperation in prosecuting

James, but "the gap between a probated sentence and a twelve-year custody sentence is dramatic and violates the Constitution."

'[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions.' *Roper v. Simmons*, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). 'Embodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to the offense."' *Graham v. Florida*, 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Proportionality 'does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime.' *Id.* at 60, 130 S.Ct. 2011 (internal quotation marks and citation omitted).

To determine whether a sentence was grossly disproportionate, 'we are to consider the gravity of the offense and the harshness of the penalty.' *Glover v. State,* 477 S.W.3d 68, 74 (Mo. App. 2015). 'Gross disproportionality will be found only in exceedingly rare and extreme cases.' *Duncan v. State*, 539 S.W.3d 95, 109 (Mo. App. 2018) (citation omitted). 'A sentence within the range prescribed by statute generally will not be found excessive, or grossly disproportionate, to the crime committed.' *Id.* (citation omitted). 'This is because we owe substantial deference to the legislature's determination of proper punishment.' *Burnett v. State,* 311 S.W.3d 810, 815 (Mo. App. 2009) (citing *State v. Pribble*, 285 S.W.3d 310, 314 (Mo. banc 2009)). 'Additionally, trial courts have broad discretion in their sentencing function, including but not limited to the discretion to order consecutive or concurrent sentences.' *Eccher v. State*, 629 S.W.3d 113, 117 (Mo. App. 2021).

If, after considering the gravity of the offense and the harshness of the penalty, we determine that the sentence was not grossly disproportionate, then 'comparisons to sentences given to other defendants for the same or similar crimes are irrelevant.' *Pribble*, 285 S.W.3d at 314. As the Supreme Court explained in *Pribble*, 'Only in the rare case that an inference of a grossly disproportionate sentence is present does a reviewing court then compare the sentences imposed on other criminals in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions.' *Id.* at 314 n.4. *See also State v. Lee*, 841 S.W.2d 648,

654 (Mo. banc 1992) (holding that a life sentence (30 years) for a first-degree robbery conviction was 'not disproportionate, much less grossly disproportionate,' and, therefore, a comparison to sentences given to other defendants for the same or a similar crime was irrelevant).

*Yuille v. State*, 654 S.W.3d 416, 422 (Mo. App. 2022).

At James's evidentiary hearing, James presented a sentencing transcript of Jamieon Parker. The transcript shows that Parker was sentenced the same day as James by a different judge. The State argued at Parker's hearing that Parker deserved leniency because the crime would not have been solved if Parker had not admitted what occurred, and the "main actor, Jaylen James, would not have been brought to justice had this defendant not agreed to testify against him." The State argued that Parker was young and "basically roped into this by the main actor, Jaylen James." According to the State, James told Parker where the victim lived, advised that money was there, and provided a gun to Parker. After the robbery, the proceeds were split with James. Because Parker and Galentine agreed to testify, James ended up pleading guilty. The State indicated that James would be sentenced that afternoon and the State was asking for a fifteen-year sentence. The State agreed with Parker's counsel that it took courage for Parker to agree to testify against James given that James was out on bond in the community and "was a known gang member in Chicago."

Parker's sentencing judge noted that Parker was sent to prison for eighteen months for violating probation once he was arrested for the robbery. He had been out seven months prior to his sentencing, had found gainful employment, and was attempting to

19

involve himself in his child's life.  The court found Parker's situation "special and different" and sentenced him to ten years, with execution of that sentence suspended and he was placed on probation for five years.

At James's evidentiary hearing, James additionally presented a sentencing transcript of David Galentine.  The transcript shows that Galentine's sentencing occurred one week after James's sentencing.  At Galentine's sentencing, the State discussed that James planned the robbery and home invasion of a friend and recruited Parker and Galentine to do it.  Galentine was eighteen years old at the time of the robbery.  Galentine had no prior criminal record.  The State suggested that the court would be justified in sentencing Galentine to "anything from the most lenient form of probation of an SIS to fifteen years in prison, because the crime itself was such a horrible violent crime of a home invasion robbery."

Galentine's counsel advised the court of the sentences Parker and James received.  Galentine had already served eleven months in the Boone County Jail for his role in the crime.  Galentine had sole custody of a child that was born while he was in custody, and was the sole provider for the child.  According to Galentine's attorney, during the course of Galentine's cooperation with the State, Galentine was threatened a number of times by James for helping the State, yet Galentine remained loyal to his agreement.  Galentine was playing college basketball, attending a community college, and maintaining a 3.75 GPA.  Galentine's sentencing judge, who was not James's sentencing judge, suspended imposition of sentence and placed Galentine on five years' probation.

In denying James's post-conviction claim, the motion court concluded that, given James's criminal history, probation was not appropriate in his case and twelve years was appropriate and within the statutorily prescribed range of punishment. The court stated that, although co-defendant Parker received a suspended ten-year sentence, such was not appropriate for James due to the seriousness of his prior convictions. The court found that James's sentence was not disproportionate to his co-defendants, as neither co-defendant had the same criminal history as James, nor were they on probation for three felonies at the time of the offense. Galentine was only eighteen years old at the time of the crime and had no prior record. Further, the co-defendants were not sentenced by the same judge. The court noted that the prosecutor stated that the crime would not have been solved, and the State would have been unable to prosecute James, if Parker and Galentine had not confessed and cooperated.

We find no clear error in the motion court's conclusion that James's sentence was not grossly disproportionate given the gravity of James's offense and James's criminal history. "Section 557.036.1, RSMo 2016, instructs courts to determine the duration of a sentence 'under all the circumstances, having regard to the nature and circumstances of the offense and the history and character of the defendant.'" *Yuille*, 654 S.W.3d at 423. It is clear the court did just that.

First, James's sentence is within the legislatively prescribed sentencing range. Second, the record reflects that James strategically chose to plead guilty to reduced charges to avoid serving a mandatory 85% if he were convicted on the more serious

21

charges. Whether or not James disputes being characterized as the "ringleader" of the crime, he acknowledged his involvement during his plea hearing and at sentencing. The transcripts James filed in support of his post-conviction motion contain allegations that James was, in fact, the ringleader who recruited the two co-defendants and even provided Parker with a firearm. While James attempts to minimize the severity of his own actions by arguing that he did not enter the victims' home himself and personally hold a gun to anyone, he certainly had no difficulty accepting the spoils of the violent crime he helped orchestrate.

James acknowledges that his crime was committed against someone he knew, grew up with, and considered a friend. Another victim of James's crime had previously been accidentally shot by James, and yet James knowingly chose the home of that particular individual to be terrorized with weapons for his own personal gain. Moreover, James had no idea when helping orchestrate the crime that his co-defendants would remain safe during a 3 a.m. home invasion involving weapons, but nevertheless willingly put his co-defendants and the victims at risk for his own personal gain while he safely awaited his portion of the spoils. We find James's twelve-year sentence more than justified by the record and not violative of the Eight Amendment's prohibition against cruel and unusual punishment.

Point II is denied.

## Point III – Ineffective Assistance of Counsel

In his third point on appeal, James contends the motion clearly erred in finding that James's counsel was not prejudicially ineffective when he failed to present available evidence in support of a lower sentence at sentencing. James argues that, while the court may have been aware of some of the information, this was not the same as having live witnesses, willing to come to court on their own time, testifying in support of the defendant. James contends that, had Counsel presented additional available evidence at sentencing, there is a reasonable probability of a different result at sentencing.

At the evidentiary hearing, James presented affidavits from a psychologist and the owner of a restaurant where James was employed, and testimony from James's fiancé, mother, grandmother, and store manager.

A psychologist's affidavit states that the psychologist was retained by post-conviction counsel to evaluate James, and that the psychologist was available to be retained by plea counsel to evaluate James for sentencing. The psychologist attached a January 21, 2022, Forensic Psychological Evaluation that he states he would have submitted to the court prior to sentencing had he been requested to do so. The evaluation details James's reported social history, which indicates that James denied any history of physical or sexual abuse. James reported experiencing various traumatic events during his childhood, however, including witnessing the violent murder of his aunt during a domestic assault. James described growing up in a neighborhood with crime and gang violence, witnessing multiple violent events, and "participating in many." His first

juvenile case was at the age of twelve for possession of a firearm. Although never "formally a gang member," James reported being involved in "peripheral gang involvement." While engaging in illegal behavior, James lived a "parallel existence" and was actively involved in high school sports. James reported extensive alcohol and drug use. James had made improvements to his actions and attitude after being sent to prison.

A business owner's affidavit states that he had no contact with James or his lawyers prior to James's sentencing, and was not requested to provide a letter in support of James at sentencing. He attached a letter which he would have submitted had he been requested to do so. The letter states that James was employed at the owner's business for approximately six months, was promoted to team leader during that time, had a great attitude and was passionate about his job, and was a pleasure to have on staff.

The business's district manager testified that James was an excellent employee and well-liked by customers. James was very excited when he learned he was going to be a father. The manager would have testified to these things at James's sentencing had the manager been asked. The manager was unaware that James had pending charges when he was hired, but was aware that he was on some form of probation because he indicated that he was unavailable to work at certain times due to meetings with his probation officer.

James's mother testified that James was a good brother to his special needs sibling. She discussed various trauma that James experienced as a child, including his aunt being murdered in front of him during a "domestic incident." Thereafter, James had

24

to deal with numerous other deaths of friends and family. Nevertheless, James still attended high school and graduated, and still attempted to go to college. James was in a variety of trouble as a teenager. James's mother was not asked by James's attorney to speak at his sentencing, but would have done so had she been asked.[2]

James's fiancé testified that, after James was arrested for his involvement in the robbery and then released from jail, he was more focused on getting his financial affairs in order. He wanted to go back to school and to start a family. She was not aware he would be getting sentenced as he told her "last minute." She was aware he had been arrested but was not apprised of the process thereafter. She was present at James's sentencing and had their child with her that day. She takes the child to visit James every Saturday at the prison. James's fiancé would have testified at his sentencing hearing had she been asked, but was not asked.

Various prison certificates were additionally introduced by James at the evidentiary hearing. These included: 1) an April 28, 2022, completion certificate for the Anger Management Program at Moberly Correctional Center, 2) a 2021 Hospice Volunteer certificate of appreciation showing that James volunteered seventy-two hours in 2021, 3) a form showing additional Hospice volunteer hours served, 4) an April 30, 2022, certificate of appreciation for participating in the New Horizons Community for nine months, 5) a September 12, 2021, certificate of completion for Mentor Class, 6) an

---

[2] James's grandmother testified that James was not a hardened criminal, and she would have testified at James's sentencing if she had been asked.

April 3, 2022, certificate of completion for Structure Class, 7) a February 28, 2022, certificate of appreciation as Department Head for the New Horizons Therapeutic Community, and 8) an October 17, 2021, certificate of completion for Leadership Revolution.

James testified at his evidentiary hearing that, after being arrested for his involvement in the robbery, he spent ten months in jail before being released on bond for a year and a half before sentencing. While on bond he attended a drug program and was employed. His lawyer did not suggest having family members or employers testify for him at sentencing. He advised his lawyer about traumatic experiences he had as a child and grief he was experiencing at the time he was involved in the robbery. James's attorney did not suggest that he speak with a psychologist about how those traumas might have impacted him. James testified to the various programs he had participated in and completed while in prison. He testified that he was presently in welding school at the prison.

James acknowledged that at the time he became involved in the robbery, he already had received a four-year prison sentence in 2018 for delivery of drugs, unlawful use of a weapon, and felony resisting arrest, with that sentence being suspended with probation. Further, while the robbery case was pending, James had pending felony charges in Cole County for two counts of felony assault third degree and one count of unlawful use of a weapon for exhibiting a weapon. Those events were alleged to have occurred in 2018. Further, after being sentenced on the robbery, James subsequently

26

entered a plea of guilty and received a four-year prison sentence on those charges to run concurrently with his other sentences, with credit for any time served. James testified that he was aware that witnesses testified that he had received $1,000 of the proceeds from the robbery.

Counsel testified at the evidentiary hearing that he introduced documentation of James's completion of substance abuse treatment from Phoenix House at sentencing, but had no other documentation. Counsel considered calling witnesses to speak on James's behalf, and coordinated for one of the victims in the case to testify that he was fine with James receiving probation. Counsel talked to James about other possible witnesses and did not believe that any others would have been persuasive enough to impact James's sentencing.

Counsel was asked if he considered having James evaluated by a psychologist to see if there might be anything he or she could say to mitigate sentencing. Counsel stated that he had, but did not think based on his conversations with James that doing so would have been persuasive to the court.

In denying James's claim, the motion court concluded that, it was aware at sentencing of some of the evidence James presented at the post-conviction evidentiary hearing via the Sentencing Assessment Report. The motion court found it reasonable for James's counsel to not present additional mitigating evidence, and that James failed to prove ineffective assistance of counsel and/or prejudice. The court stated that, while James may have engaged in positive behaviors after the crime, twelve years was still an

appropriate sentence. The court found that the evidence presented at the evidentiary hearing would not have changed the court's sentencing decision. The court reiterated that James was on probation for three serious felonies at the time he committed "another ruthless felony," was later convicted of three other felonies with two of those being "serious assaults," and another weapons offense where "he exhibited, yet again, another deadly weapon in an angry or threatening manner."

We agree that James fails to meet his burden of showing that counsel was ineffective in failing to present additional mitigating evidence at sentencing, or that James was prejudiced by any of counsel's decisions. We find no reasonable likelihood that the evidence presented at James's post-conviction evidentiary hearing would have influenced any reasonable judge to lower the sentence imposed.

The psychologist's evaluation revealed that James lived a parallel existence, balancing a life of crime with school and sports activities. This parallel existence was concealed from James's mother, who testified that she communicated with James daily and thought he was fine and back in school, until she received the call that he was in jail. James's mother additionally reported negative information regarding James that may have been unknown to the court at sentencing. She revealed that James was a "troublesome" teenager who was involved in the juvenile system in Illinois, and was placed outside of the home for six weeks where "he was supposed to have learned his lesson." James did not learn his lesson as evidenced by his later crimes. James's report to the psychologist of peripheral gang involvement in Chicago, and prior participation in

28

many violent events, lends credence to the fears of co-defendants and victims expressed in the record.

James's fiancé's testimony suggested that James was still living a parallel existence at the time of sentencing, as the fiancé revealed that she had no idea James was being sentenced until it occurred. This was a woman James had an eight-year relationship with, was living with, and chose to start a family with while he was out on bond awaiting sentencing. This woman followed James from Chicago, Illinois to Missouri when James moved to attend college.

James's reported history of being adversely affected by various deaths in the family, including James's aunt being killed in front of him in a domestic violence incident, in no way mitigates James's choice to be involved in a violent crime, and in no way reduces his culpability in helping orchestrate a crime which placed other individuals, including a personal friend and an individual James had previously shot, in danger for his own gain.

The motion court did not clearly err in concluding that James's counsel was not prejudicially ineffective when he failed to present additional evidence in support of a lower sentence. James fails to prove that Counsel's decision was not sound sentencing strategy, or that there was a reasonable probability that the introduction of additional evidence would have produced a more favorable result at sentencing.

Point III is denied.

## Conclusion

The circuit court's judgment is affirmed.

_____
Anthony Rex Gabbert, Judge

All concur.